# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**CHRISTOPHER GOODVINE,**
   **Plaintiff,**

  v.                 Case No. 13-CV-1057

**DR. GEORGE MONESE**
   **Defendant,**

## DECISION AND ORDER

Christopher Goodvine, a Wisconsin inmate, alleges that Dr. George Monese, a psychiatrist at the Wisconsin Resource Center (WRC), provided him with inadequate medical care while he was confined at that institution. Before me now is the defendant's motion for summary judgment. Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take the evidence in the light most favorable to the non-moving party and may grant the motion only if no reasonable juror could find for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255 (1986).

## I. BACKGROUND

The Wisconsin Resource Center is a specialized mental health facility established as a prison under Wisconsin Statute § 46.056. The facility operates as a secure-treatment center and is managed by the Wisconsin Department of Health Services, Division of Mental Health and Substance Abuse. Inmates within the Wisconsin prison system are referred to the WRC for treatment of behavioral and mental health issues. The goal of

treatment at the WRC is to modify an inmate's behavior and enable him to be returned to the general prison population.

Goodvine was admitted to the WRC on August 29, 2012. Prior to that date, he was confined in ordinary Wisconsin prisons and had a history of engaging in various forms of misbehavior, including self-harm. The misbehavior was attributed to "maladjustment within the prison environment," and he had been diagnosed with mood disorder and antisocial personality disorder. Def. Prop. Findings of Fact ("PFOF") ¶ 19. Goodvine was referred to WRC to participate in a "coping skills" program, which was designed to help him with these issues.

On August 30, 2012, Dr. Monese conducted an initial examination of Goodvine. This was not Monese's first encounter with Goodvine, as Goodvine was referred to the WRC in 2010 and received treatment from Monese at that time. During the exam, Monese determined that after Goodvine was discharged from the WRC in 2010, he did relatively well in the general prison population, but only for a short time. Goodvine reported that he had a tendency to self-injure, got angry a lot, and was disappointed with his life. He also reported that he had a history of engaging in hunger strikes. At the time of his admission to the WRC, however, Goodvine weighed 270 pounds and was seriously overweight. Goodvine also informed Monese that he sometimes thinks of committing suicide. The WRC referral report indicated that Goodvine had recently engaged in self-harm by overdosing on 56 pills of Tylenol and cutting his arms. The report stated that Goodvine will engage in self-injurious behavior when he does not get his way. After the examination, Dr. Monese concluded that Goodvine's behavior was largely attributable to his personality

2

disorder, although he noted that Goodvine might also have a legitimate mood disorder like depression.

At the time of his admission to the WRC, Goodvine had been taking Seroquel, an antipsychotic medication. Monese decided to continue that medication, and he also prescribed Wellbutrin, an antidepressant. To promote weight loss, Monese placed Goodvine on a lower-calorie diet. Monese informed Goodvine that because of his history of self-harm, the WRC would classify him as having a "high" risk of suicide. See Goodvine Decl. ¶ 18, ECF No. 47.

About one month after his admission to WRC, Goodvine began to refuse his meals. When nursing staff asked Goodvine about this, he replied that he "fasts sometimes." Def. PFOF ¶ 47. Staff at the WRC interpreted Goodvine's refusing meals as the initiation of a hunger strike, and they placed Goodvine on the institution's hunger-strike protocol. Goodvine started declining his meals on about September 25, 2012. From that date until October 1, 2012, he generally declined his meals but intermittently drank juices and Ensure and ate crackers and soup.

On October 1, 2012, Monese met with Goodvine at his cell. By this time, Goodvine had completed the coping-skills program and was informed that he was ready to be returned to prison. Goodvine told Monese that he felt depressed about this and expressed a desire to remain at the WRC to participate in other programs, including a program known as "DBT."[1] Monese then had a discussion with one of the staff members who had been

---

[1] Although I have been unable to find anything in the record that identifies what DBT stands for, it likely stands for dialectical behavior therapy, which is designed to help individuals prone to self-harm and suicidal thinking. See http://en.wikipedia.org/wiki/Dialectical_behavior_therapy (last viewed March 24, 2015).

3

working with Goodvine. That staff member told Monese that Goodvine had completed the coping-skills program and that he was not a candidate for DBT. Monese also spoke with Goodvine about his not eating, and Goodvine told Monese that he had lost his appetite. Monese decided to prescribe Goodvine cyproheptadine, a medication that could help improve his appetite. The medication was also prescribed to treat Goodvine's complaints of nightmares. During this meeting, Goodvine told Monese that he would kill himself before he returned to the general prison population. Goodvine also told Monese that although he would not eat, he would continue to drink Ensure. After the exam, Monese wrote in his report that he would discuss with others at the WRC whether Goodvine could participate in the DBT program. However, Monese concluded that Goodvine's propensity to self-harm was likely more volitional than impulsive, and that therefore DBT was likely not an appropriate treatment.

On October 4, 2012, staff at the WRC examined plaintiff and found that he weighed 244 pounds, a loss of 26 pounds since his admission to the WRC. Around this time, Goodvine's feelings of depression and self-harm continued to worsen, and he began to hoard his medications in preparation for a suicide attempt. Pl. PFOF ¶ 50. However, on October 9, 2012, Goodvine received letters from his family that lifted his spirits. On October 10, 2012, Goodvine voluntarily notified WRC staff that he had been hoarding his medications. Staff members found Goodvine in possession of a large quantity of Tylenol and Seroquel pills. One staff member noted on Goodvine's chart that he was found with 30–40 pills in total. Monese Decl. Ex. 1 at 11. When staff informed Monese of what they had found, Monese decided to discontinue Goodvine's prescription for Seroquel and ordered that his remaining medications (except for Wellbutrin) be crushed. (Crushing the

4

medications before giving them to an inmate is apparently a technique to prevent hoarding.)

On October 10, 2012, upon learning that Monese had discontinued his Seroquel, Goodvine wrote to Monese and asked him to continue that prescription. Monese replied that he was aware of the situation and would address it with Goodvine at their next clinical encounter.

On October 14, 2012, Goodvine submitted a written notice to WRC staff in which he requested a "do not resuscitate" order and indicated that he did not want to be resuscitated on October 16, 2012 or October 17, 2012. He also prepared a will. As soon as WRC staff members received these papers, they referred Goodvine to Dr. Monese.

On October 15, 2012, Dr. Monese met with Goodvine in the dayroom of the segregation unit. Goodvine told Monese that he was very depressed, had been having thoughts of self-harm, and wanted to resume taking Seroquel, as that was the only medication that helped him. Monese explained that because Goodvine had been hoarding Seroquel, he could not continue that medication. Monese also noted that because of Goodvine's continuing lack of appetite, Wellbutrin was probably not an appropriate medication for him, as appetite loss is one of its side effects. After discussing possible medications with Goodvine, Monese decided to prescribe him Loxitane, an antipsychotic that replaced the Seroquel, and Prozac, an antidepressant that replaced the Wellbutrin. In his notes from the visit, Monese indicated that he confronted Goodvine about his "writings and behaviors"—presumably the will, request for a do-not-resuscitate order, and hoarding of medications, and wrote that Goodvine reported "fleeting thoughts of self-harm, but no immediate intention to do so right now." Monese Decl. Ex. 1 at 31. Goodvine

5

disputes this characterization of their conversation and contends that he "unequivocally" told Monese that he was "imminently suicidal" and that he believed he would immediately harm himself if he was returned to his cell. Goodvine Decl. ¶ 60.

At the conclusion of the exam, Goodvine was returned to his cell. Shortly thereafter, he covered his cell window, placed a tourniquet on his left arm to make his artery more visible, then seriously and deeply lacerated his right arm in the area of his elbow. Goodvine punctured a major vein or artery, and blood began pouring from his arm and covering the floor. While Goodvine was still conscious, a staff member discovered Goodvine and alerted medical staff. See ECF No. 45-13. Dr. Monese was paged and arrived at the scene along with nursing staff. Paramedics were also called, and after some initial treatment at his cell, Goodvine was taken to the hospital emergency room, where the laceration was sutured.

On October 16, 2012, Goodvine was returned to the WRC. Pl. PFOF ¶ 82. He remained there for two days and was returned to prison on October 18, 2012.

## II. DISCUSSION

In the present suit, Goodvine alleges that Monese was deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose. E.g., Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011). A claim based on deficient medical care must demonstrate two elements: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. Id.

The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one. Pyles v. Fahim, 771 F.3d 403, 408–09 (7th Cir. 2014). Deliberate indifference is a subjective standard. Arnett, 658 F.3d at 751. To demonstrate deliberate indifference, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind, something akin to recklessness. Id. A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. Id. Deliberate indifference is more than negligence and approaches intentional wrongdoing. Id. In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir.2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Id. (quotation marks omitted). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." Arnett, 658 F.3d at 751 (quotation marks omitted).

A prisoner, however, "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." Walker v. Benjamin, 293 F.3d 1030, 1037 (7th Cir.2002); see also Duckworth, 532 F.3d at 679 ("[A]lthough deliberate means more than negligen[ce], it is something less than purposeful."). Nor does a prisoner need to show that he was literally ignored. Greeno v. Daley, 414 F.3d 645, 653 (7th Cir.2005). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the

7

treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." Id. (quotation marks omitted).

In alleging that Monese acted with deliberate indifference in his treatment, Goodvine focuses on three aspects of Monese's care: (1) prescribing Wellbutrin; (2) discontinuing the Seroquel prescription; and (3) failing to take adequate precautions in response to Goodvine's risk of suicide.

**A.      Wellbutrin**

First, Goodvine contends that Monese acted with deliberate indifference when he prescribed Wellbutrin, which carries a risk of appetite loss, and then failed to discontinue the medication once he learned that Goodvine was refusing his meals. However, there is no evidence in the record from which a jury could reasonably conclude that Monese's actions in prescribing Wellbutrin and continuing the prescription for as long as he did were so inappropriate that no minimally competent psychiatrist would have taken them. At the time Monese prescribed the medication, Goodvine was seriously overweight and had not been diagnosed with an eating disorder or other condition for which Wellbutrin was contraindicated. On October 1, 2012, only a few days after Goodvine began refusing meals, Monese saw Goodvine and spoke to him about his appetite loss. In response, Monese prescribed cyproheptadine, a medication that was intended to stimulate his appetite. Fifteen days later, when Monese examined Goodvine again and determined that the cyproheptadine had not improved Goodvine's appetite, Monese discontinued the Wellbutrin prescription. I have no reason to think that these actions were not perfectly appropriate responses to Goodvine's complaints of appetite loss. Although Goodvine thinks that Monese should have discontinued the Wellbutrin as soon as he learned about

8

Goodvine's refusing meals, there is no evidence in the record suggesting that an immediate discontinuation of the medication was the only responsible choice under those circumstances. Accordingly, Monese is entitled to summary judgment on this issue.[2]

**B.      Seroquel**

Next, Goodvine contends that Monese acted with deliberate indifference when he discontinued Goodvine's Seroquel prescription after learning that he had been hoarding pills. Again, however, there is no evidence in the record from which a jury could reasonably infer that every minimally competent psychiatrist would have continued the medication under these circumstances. Discontinuing the medication might have been a perfectly appropriate response to Goodvine's having hoarded it in preparation for a suicide attempt. Moreover, Monese did not discontinue the medication and then leave Goodvine entirely unmedicated for an extended period. Five days after discontinuing Seroquel, he prescribed Loxitane, which is a different antipsychotic. Finally, there is no evidence in the record from which a jury could reasonably find that the lack of Seroquel for five days had any adverse effect on Goodvine's health. To the extent Goodvine believes that the lack of Seroquel caused his suicide attempt on October 15, there is no evidence in the record suggesting that discontinuing an antipsychotic medication such as Seroquel could have such an effect in such a short period of time. Thus, the jury could not reasonably infer that Monese's discontinuing Seroquel for five days constituted deliberate indifference to Goodvine's serious medical needs.

---

[2]Goodvine also seems to contend that Monese should not have prescribed Wellbutrin to a person who is having thoughts of suicide. Again, however, there is no evidence in the record indicating that Goodvine's history of self-harm would have caused every minimally competent psychiatrist to refrain from prescribing him Wellbutrin.

9

**C.     Response to thoughts of suicide**

Finally, Goodvine contends that despite Monese's knowledge of a substantial risk that Goodvine would seriously harm himself on October 15, 2012, he took no steps to abate that risk, with the result that Goodvine attempted suicide later that day. Monese does not dispute that he was aware that Goodvine was a suicide risk the entire time he was in the care of the WRC. Indeed, one of the main reasons he was referred to the WRC was because of his propensity towards self-harm. However, Monese does deny that Goodvine stated unequivocally on the morning of October 15 that he intended to attempt suicide immediately upon returning to his cell. But because at the summary-judgment stage I must view the facts in the light most favorable to Goodvine, I will assume that Goodvine told Monese that he was having thoughts of attempting suicide immediately.

Goodvine claims that Monese did nothing in response to his expressing thoughts of attempting suicide immediately. However, Goodvine overlooks the fact that he was already housed in an institution that was equipped to deal with suicidal behavior, and that the WRC had already designated him as posing a high risk of suicide. No evidence in the record supports the conclusion that every minimally competent psychiatrist would have taken additional precautions in response to Goodvine's having said that he feared a suicide attempt was imminent. Goodvine contends that Monese could have taken precautions such as sending him to an observation cell or having his cell searched. But despite Goodvine's claiming that he felt that a suicide attempt was imminent, Monese's clinical impression, as reflected in his notes of the visit, was that Goodvine was not an immediate suicide risk. No evidence in the record suggests that once Goodvine said that he felt that

10

a suicide attempt was imminent, Monese was required to believe him and place him in the most restrictive cell available at the WRC or take other drastic measures.

In any event, as noted, Goodvine was already being closely monitored by WRC staff, and they discovered him only moments after he attempted suicide and were able to provide him with immediate and effective treatment. Thus, it is not clear that placement in an observation cell would have made a difference, as there is no evidence in the record showing that placement in an observation cell results in uninterrupted monitoring or would have deprived Goodvine of access to whatever he used to lacerate his arm. As for the suggestion that Monese could have had Goodvine's cell searched, it is not clear that this would have prevented the suicide attempt, as WRC staff members searched Goodvine and his cell after the suicide attempt and were unable to locate anything that Goodvine might have used to cut himself. See ECF No. 45-4 at p. 17.

In short, Goodvine was already being closely monitored by WRC staff, and staff members were aware that Goodvine posed a high risk of suicide at all times. Because of this, a jury could not reasonably conclude that Monese acted with deliberate indifference to Goodvine's suicide risk when he failed to order additional precautions in response to Goodvine's most recent thoughts of suicide. Monese did not disregard Goodvine's suicide risk but concluded that existing precautions were adequate to manage the risk.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment (Docket #30) is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 25th day of March, 2015.

                                s/ Lynn Adelman
                                _____
                                LYNN ADELMAN
                                District Judge